**Mark S. DeMarco**
Attorney At Law
100 Lafayette Street, Ste. 501
New York, New York 10013
718 239 7070
Fax 718-239-2141
MSDLaw@aol.com

January 4, 2026

Honorable Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

**BY ECF, ELECTRONIC MAIL & HAND DELIVERY**

**Re: *United States v. Jerome Waters***
**24 Cr. 413 (KAM)**

Your Honor:

**Introduction**

Jerome Waters is 25 years old. He is a brilliant and extremely gifted young man who struggled to balance his promising future with the responsibility he felt to care for his ailing mother. Jerome Waters was also a community leader, entrepreneur, talented musician and role model, who cared deeply about his family, his friends and his community. **See Defendant's Exhibit A, Photographs of Jerome Waters.**

When Jerome was only 17 years old, he established Humble Beast Movement, LLC, a multi-faceted brand, primarily known for HBM Studios in Baltimore, a recording studio offering a creative space for artists, and also linked to a larger Christian music label ("humble beast") featuring artists like Beautiful Eulogy and Braille. *See PSR ¶ 96*

Further, in 2019, as a member of the Johns Hopkins Center for Adolescent Health's Youth Advisory Board, 19-year-old-Jerome organized a concert in New York City to showcase the talent of young musicians and artists. The showcase included five performers from Jerome's' Humble Beast Movement record label, who emphasize positive messages in their music. **See Defendant's Exhibit B, Newspaper Articles.**

Indeed, upon closer scrutiny this case is about the is the derailment of a promising and gifted young mind, by a childhood beset by violence, drug abuse, instability and death. His involvement in this case represents another "senseless act of violence" engaged in by inner city youth played out on the streets, another life lost to the dangers and risks of the drug trade and the violence of the streets.

The events that set the stage for this tragic crime which took place on the streets of Queens on July 25, 2024, began many years before. Jerome, like many young inner-city boys began

his life with all the promise and expectation that a child has for the world. However, Jerome was born into circumstances that would serve to derail his life, and deprive him of an opportunity to fulfill his enormous potential.

Jerome was and continues to be a young man of promise whose life was derailed by by a series of poor choices that he can never undo and he will pay a significant price for these choices. However, he remains a young person of extraordinary promise and potential, and deserving of some leniency in the face of the serious charges upon which he has accepted responsibility and pleaded guilty. The information contained herein is not meant to denigrate the seriousness of the offense, nor the losses likely felt by the relatives of the victim. Indeed, it is well-established that mitigation evidence is not permitted as an excuse or justification for engaging in criminal conduct, but rather as mitigation in the length of sentence or punishment to be imposed as a result of that criminal conduct. *See, Lockett v. Ohio*, 438 U. S. 586 (1978), *Abdul Kabir v. Quarterman*, 550 U.S. 233, 246 (2007); *See also, 18 U.S.C. §3661* and *21 U.S.C. § 859.*

On October 17, 2025, Mr. Waters pleaded guilty to Counts Two and Three of the above-reference indictment which charged him with Hobbs Act robbery in violation of *18 U.S.C. § 1951* and Discharge of a Firearm in Furtherance of that robbery in violation of *18 U.S.C. § 924(c)*. He is scheduled to be sentenced by Your Honor on January 21, 2026.

Although convicted of a violent crime which resulted in murder, Jerome remains a young man of extraordinary potential. In many ways, he represents the inner city violence that has plagued both our federal and state courts for the past quarter of century. While he must be punished for an unjustifiable act of murder, Congress has granted this Court great sentencing discretion, especially where a defendant in his youth commits a crime as serious as murder. To understand how Jerome's life path led him this point – to participating in a gun-point robbery that resulted in murder – and why this court should even consider granting this promising young man leniency, it is essential to analyze from where he came.

This memorandum is submitted to paint a picture of the promising young man that this Court will be sentencing. Indeed, this letter is submitted to provide information to assist this Court in fashioning a sentence "sufficient but not greater than necessary" to achieve the statutory purposes of punishment, as required by 18 U.S.C. § 3553(a) in light of *United States v. Booker*, 543 U.S. 220 (2005).

Mr. Waters respectfully requests that this Court consider his difficult childhood, troubled background and numerous good character traits which warrants imposition of sentence substantially below advisory guideline range, an appropriate sentence satisfying the objectives embodied in Booker and § 3553(a).

**Application of the Section *3553(a)* Factors Calls for a**
**Sentence of Twelve Years Imprisonment**

***18 U.S.C. § 3553(a)* Factors**

Pursuant to the Supreme Court's decision in *United States v. Booker*, the Guidelines are advisory; a sentencing court may depart in the interest of justice as well as in light of other statutory concerns as expressed in section 3553(a). *United States v. Booker*, 543 U.S. 220, 245-46, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005); see also *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) ("It is now, however, emphatically clear that the Guidelines are guidelines — that is, they are truly advisory. A district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense.").

A sentencing court shall "state in open court the reasons for its imposition of the particular sentence." *18 U.S.C. § 3553(c)*. If the sentence is not of the kind prescribed by, or is outside the range of, the Sentencing Guidelines referred to in section *3553(a)(4)* of title 18, the court shall indicate the specific reasons for imposing a different sentence. See *18 U.S.C. § 3553(c)(2)*. These "reasons must also be stated with specificity in a statement of reasons form." Id. Even though the Guidelines are now advisory rather than mandatory,[*Booker*, 543 U.S. at 245-46], the sentencing court must still adhere to the requirements of 18 U.S.C. § 3553(c)(2). *United States v. Jones*, 460 F.3d 191, 197 (2d Cir. 2006). The sentencing court's written statement of reasons shall be "a simple, fact-specific statement explaining why the Guidelines range did not account for a specific factor or factors under *§ 3553(a)*." *United States v. Rattoballi*, 452 F.3d 127, 138 (2d Cir. 2006), abrogated in part on other grounds by *Kimbrough v. United States*, 552 U.S. 85, 128 S. Ct. 558, 169 L. Ed. 2d 481 (2007). The statement should demonstrate that the court "'considered the parties' arguments' and that it has a `reasoned basis for exercising [its] own legal decision making authority.'" *Cavera*, 550 F.3d at 193 (quoting *Rita v. United States*, 551 U.S. 338, 356, 127 S. Ct. 2456, 168 L. Ed. 2d 203 (2007)).

In view of the excessive incarceration rates in the recent past and their unnecessary, deleterious effects on individuals sentenced, society, and our economy, parsimony in incarceration is prized. See, e.g., *18 U.S.C. § 3553(a)* ("The court shall impose a sentence sufficient, but not greater than necessary."); National Research Council of the National Academies, The Growth of Incarceration in the United States, Exploring Causes and Consequences, 8 (2014) ("Parsimony: the period of confinement should be sufficient but not greater than necessary to achieve the goals of sentencing policy.").

Accordingly, a court "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of the Guidelines. *18 U.S.C. § 3553(a)*. The Guidelines range is the "starting point and the initial benchmark." *United States v. Johnson, 567 F.3d 40, 51 (2d Cir. 2009) (quoting Gall v. United States, 552 U.S. 38 (2007))*. "A district court is authorized to depart from a Guidelines range if the court finds that 'there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing

Commission in formulating the guidelines that should result in a sentence different from that described.'" *United States v. Juvenile Male Po, 466 Fed. Appx. 14, 15 (2d Cir. 2012) (summary order) (citing 18 U.S.C. § 3553(b)).*

**The Sentencing Factors As Applied to Jerome Waters**

*18 U.S.C. § 3553(a),* and *United States v. Crosby, 397 F.3d 103 (2d Cir. 2005)*, outline the task facing district courts in considering the guidelines. The court must determine the applicable guidelines range, and further consider applicable policy statements. After thus considering the guidelines, the Court must consider all the other factors set forth in *§ 3553(a)* before determining whether (i) to impose the sentence that would have been imposed under the guidelines, i.e. a sentence within the applicable guideline range or within permissible departure authority, or (ii) to impose a non-guideline sentence.

*18 U.S.C. § 3553(a),* and *United States v. Crosby, 397 F.3d 103 (2d Cir. 2005)*, outline the task facing district courts in considering the guidelines. The court must determine the applicable guidelines range, and further consider applicable policy statements. After thus considering the guidelines, the Court must consider all the other factors set forth in *§ 3553(a)* before determining whether (i) to impose the sentence that would have been imposed under the guidelines, i.e. a sentence within the applicable guideline range or within permissible departure authority, or (ii) to impose a non-guideline sentence.

**Personal Characteristics**

**Jerome Waters's Life: A Child With Promise**

Jerome Waters was born in Baltimore on December 14, 2000. When he was only 8 years old, his father – Jerome Waters Sr. – was murdered in Baltimore. As his older brother Andre Davis writes:

> When Jerome lost his father to gun violence at a very young age, I saw how deeply it affected him. But instead of going down the wrong path, he changed for the better. His demeanor matured. He became more focused, more serious about life, and more protective of our family. That loss stayed with him and pushed him to try to be someone younger kids could look up to.

**See Exhibit C, Letters in Support & Photographs,** ***Ltr. of Andre Davis***.

However, after his father's death, Jerome's life changed significantly. His mother remarried and Jerome had "issues" with his stepfather, who battled substance abuse and was physically abusive. *See PSR* ¶ ¶ 80-81. When Jerome was in middle school he recalls being beaten by his stepfather whenever he received bad reports from school. Jerome also recalls his stepfather taking him to the basement where he would turn on loud music to drown out his belt-

inflicted beatings which left welts and scars that are visible to this day. *See PSR ¶ 81*.

Other members of Jerome's family also abused drugs and alcohol. His stepsister Alexis battled alcoholism and Jerome was aware that other family members abused drugs like crack cocaine. *See PSR ¶ 81*

While many young people turn to the streets or to drugs, Jerome turned to music to escape his tumultuous environment. He learned how to play the trumpet, joined a band and earned admission into Patapsco High School and Center for the Arts[1], where he earned first chair as a trumpet player.

Like many young men from Baltimore, Jerome grew up in an unstable, violent and abusive environment. Although he remained in school, he was not sheltered or protected from the crime and violence on the streets. He was the victim of attempted robberies and shootings; he witnessed friends engaging in violence, and; when he was 15 years old, he witnessed his friend get shot, dying in Jerome's arms. While becoming numb to the violence around him, Jerome decided to ultimately leave Baltimore to pursue a career in music in California.

**Jerome Waters in California: Promise and Pressure**

After graduating from high school, Jerome's future in the music industry was so bright and promising that he moved to California where he interned with RCA and Columbia Records before securing a full-time as songwriter for Columbia Records. He worked with various artists; outsourced music to ensure its quality prior to release, and; assisted artists compile their albums. *See PSR ¶ 95*.

**Jerome Returns to Baltimore to Care for his Mother**

Just when he thought he "had finally made it [in the music industry]" [*See PSR* ¶ 83], his mother took ill forcing Jerome to return to Baltimore to care for her. As she writes:

> One of the strongest reflections of Jerome's character is how he cares for his family. I underwent open-heart surgery in 2021 and an additional surgery in 2024 with Jerome by my side every step of the way. He helped with daily tasks, drove me to appointments, assisted during my recovery, and provided emotional and physical support. He put his own needs aside to make sure I healed safely. His

---

[1] Patapsco incorporated a performing and visual arts magnet in 1995, and has since become a leader in the state for its programs in vocal and instrumental music, performance and technical theatre, dance, and visual art. Students are required to audition for these magnet programs the year prior to attending. Patapsco was recently one of five schools in the nation to be awarded the John F. Kennedy Center for the Performing Arts School of Excellence in Arts Education. The individual programs have also won numerous awards and championships locally, regionally, and nationally.

> compassion, dependability, and protective nature during those very difficult times showed the depth of his heart and the man he is.

**Defendant's C, *Email from Gina Brown***

Jerome felt that his return to Baltimore set his life "back at square one." *See PSR* ¶ 83. For the next four years, instead of working full-time in the music industry, Jerome relied on music festival promoters who hired him to manage their music festivals. On average, he worked one festival per month earning between two-and-three-thousand-dollars music for each.

Jerome was now the sole financial provider for his household. His mother was unable to work, bills were mounting, rent was in arrears and Jerome was financially and emotionally desperate. Wanting to provide for his ailing mother and have money for staples such as food, Jerome fell prey to the drug culture that surrounded him and he voluntarily agreed to participate in the gunpoint robbery of marijuana in New York City. No one could reasonably characterize him as a leader or manager or supervisor or organizer of the robbery plan. *See PSR* ¶ 22.

**<u>Jerome Waters is a Devoted Son, Relative & Friend</u>**

As set forth in the attached family letters and photographs [**See Defendant's Exhibit C**], Jerome's family members extol him as an kind, loving, generous, sincere, devoted and inspiring son, brother, uncle and friend. His mother Gina Brown describes her son as a "polite, well-spoken, friendly, and well-mannered" young man, who has "always been active in his school and community." She writes how Jerome:

> [P]articipated in the school band and worked as a music tech at TLC Church where he volunteered during youth programs and church events. He helped elderly neighbors shovel snow in the winter without being asked and often accompanied me to deliver food to families in need. Service and kindness have always come naturally to him.

*Email of Gina Brown*.

His 89-year-old grandmother Shirley Motley writes:

> I have known Jerome his entire life and have had the blessing of watching him grow from a child into a young man. Since he was a little boy, he has always been good-natured and kind-hearted. He would visit me almost every day after school to check on me, help me around the house, carry things for me, and make sure I was well. That caring spirit has always been a part of who he is.

> Throughout the years, Jerome has consistently shown love for his family, respect for his elders, and kindness toward everyone around him. He has always been willing to help me, and other family members whenever needed, and he has shown sincere concern for my well-being as I have gotten older.
>
> Jerome has also demonstrated discipline and dedication through music. He played the trumpet in his high school band, and one of my proudest moments was when he played "Happy Birthday" for me at my 80th birthday party. That thoughtful gesture was a true reflection of his character.

*Ltr. of Shirley Motley*.

In addition to recalling how he "stepped up in every way" when their mother had surgery, older brother Andre Davis describes Jerome as a devoted uncle, writing:

> [Jerome] is also a huge part of our family. My two sons McCoy and Mason, ages 5 and 4, absolutely love their Uncle J. They enjoy every moment with him. He has always been present at family gatherings, at kids' events, and during all the little moments that mean the most. It has been extremely hard explaining to them why he isn't around right now.

*Ltr. of Andre Davis.*

Jerome's cousin Lakayla Waters recalls a time when her sister was battling "alcoholism and addiction."

> During an incredibly difficult time for our family, Jerome remained present, attentive, and deeply invested in her well-being. He checked in often, offered emotional support, and genuinely wanted to see her get better. His concern was not surface-level – it came from a place of love, responsibility, and a sincere desire to help protect and uplift our family.

*Ltr. of Lakayla Waters.*

The balance of the letters from Jerome's family and friends describe him as a caring, loving, generous, nurturing and dedicated young man.

**<u>Incarceration at the MDC Brooklyn</u>**

Since his arrest on October 23, 2024, Jerome has been incarcerated at the Metropolitan Detention Center (MDC) in Brooklyn, the conditions of which are well known to the Court. Judge Colleen McMahon described the MDC as "disgusting" and "inhuman," see Sentencing Transcript

at 19-21, *United States v. Days*, Case No. 19-CR-619 (CM) (S.D.N.Y. Apr. 29, 2021) (ECF No. 35), and Judge Cheryl L. Pollak described it as a "third world country" prison. *See* https://www.nydailynews.com/2016/10/07/exclusive-judge-refuses-to-send-women-to-brooklyn-jail-with-third-world-conditions/.

The Honorable Jesse M. Furman had the following to say about the conditions at the MDC:

> In the winter of 2019, a power outage left inmates without light or heat for a full week while a polar vortex swept the East Coast. Since that time, the dockets of this Court and the Eastern District have been filled with cases in which defendants complain about near-perpetual lockdowns (no longer explained by COVID-19), dreadful conditions, and lengthy delays in getting medical care. Contraband – from drugs to cell phones – is widespread. At least four inmates have died by suicide in the last three years. It has gotten to the point that it is routine for judges in both this District and the Eastern District to give reduced sentences to defendants based on the conditions of confinement in the MDC. Prosecutors no longer even put up a fight, let alone dispute that the state of affairs is unacceptable.

*United States v. Chavez*, Case No. 22-CR-303 (JMF), 2024 WL 50233, at *1 (S.D.N.Y. Jan. 4, 2024) (internal footnotes omitted).

The Court ultimately held that "the conditions at the MDC constitute 'exceptional reasons' why detention of most defendants who do not pose a risk of flight or danger to the community … 'would not be appropriate'" Id. at *8 (citation omitted).

Further, as Judge Brown noted in *United States v. Colucci*, Case No. 23-CR-417 (GRB), 2024 WL 3643857 (E.D.N.Y. Aug. 5, 2024), the determination of sentence " is further complicated by an extrinsic factor that looms large in nearly every bail and sentencing determination made in this judicial district: the dangerous, barbaric conditions that have existed for some time at the" MDC, where:

> Chaos reigns, along with uncontrolled violence. *Griffin*, 2024 WL 2891686 at *3 (describing rampant "violence and the threat of violence" at MDC). Through review of sealed documents, official government statements, judicial opinions and news media reports, this Court has identified shocking instances of brutal violence within the facility. This review is necessarily limited, as the Court's access to relevant information was exceptionally narrow. In other words, there were, most certainly, other incidents not collected during this Court's review. Nevertheless, the results are staggering.
>
> Each of the five months preceding this opinion was marred by instances of catastrophic violence at MDC, including two apparent homicides, two gruesome stabbings and an assault so severe that it resulted in a fractured eye socket for the victim. One knife attack was captured on a surveillance video producing images

> that are horrifying beyond words. The activities precipitating these attacks are nearly as unthinkable and terrifying as the ensuing injuries: drug debt collection, fights over illegal narcotics, resisting an organized gang robbery, internecine gang disputes and as yet-unidentified "brawls."

*United States v. Colucci*, Case No. 23-CR-417 (GRB), 2024 WL 3643857 (E.D.N.Y. Aug. 5, 2024)

**Jerome's Post-Arrest Conduct**

Since his incarceration, Jerome has been a gentleman and a near-model inmate. He has maintained a low-profile at the MDC and has incurred only three minor disciplinary infractions.

Further, Jerome has completed several educational programs and courses offered at the MDC, including two classes offered by Columbia University: History of Philosophy and Oedipus. *See PSR ¶ 85.* Indeed, Jerome plans to continue on this path when released from prison. He plans on continuing to right his wrongs by living a law-abiding and productive life with his family and to contribute positively to his community.

**Jerome Waters Deeply Regrets His Actions**

Most importantly, Jerome has expressed true, heartfelt remorse for his actions. As his mother writes:

> This situation is completely out of character for him. Jerome has expressed sincere remorse and regret for being around the wrong people at the wrong time. He understands the seriousness of his choices and is committed to growing from this experience.

*Email of Gina Brown*.

In addition, the appended letters evidence the sincere and profound regret that he now feels for his actions. *See e.g., Ltr of Nayona Herbert* (" I have seen him take accountability for his actions and make a real effort towards personal growth."); *Ltr of Donald Johnson* ("I have seen firsthand the remorse he carries."); *Ltr of Lakayla Waters* ("He has expressed remorse for his actions and understands the weight of the situation he is facing."); *Ltr of Taesha Poteat* ("He has expressed genuine remorse, taken accountability, and understands the seriousness of his circumstances.").

Jerome Waters, who is an intelligent, insightful and soft-spoken young man, has accepted responsibility and is incredibly remorseful for the crimes that he has committed.

**Conclusion**

As set forth above, Jerome Waters is a bright and gifted young man whose life has been derailed by a series of poor choices. To incarcerate him any longer than is necessary would be a complete and utter waste of valuable human life and would effectively announce that there is nothing redeemable about this man, that he has nothing left to give humanity. The is most certainly not the case.

In this case, Jerome has taken a crucial first step – recognizing that he made a horrendous mistake in judgment by participating in crimes that has brought him before this Court. By accepting responsibility for his actions he has commenced the long journey toward redemption.

Accordingly, for the reasons set forth above – the extraordinary facts and circumstances of this case and the extraordinary characteristics of the defendant – it is respectfully requested that this Court impose a sentence of 12 years imprisonment. Such a sentence would take into effect the guidelines analysis and all of the sentencing factors of *18 U.S.C. § 3553*.

Thank you for your attention to this matter.

Respectfully submitted,

*Mark S. DeMarco*

Mark S. DeMarco
Elizabeth Macedonio
Attorneys for Jerome Waters

cc: Chand Edwards-Balfour, Esq.
Adam Amir, Esq.
Assistant United States Attorneys
By ECF & Electronic Mail